UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON L. GRIFFIN, | Case No.: 21cv601-WQH(KSC) |
| Petitioner, | |
| | **REPORT AND RECOMMENDA-** |
| v. | **TION RE PETITION FOR WRIT OF** |
| | **HABEAS CORPUS** |
| WARREN L. MONTGOMERY, Warden, | |
| Respondent. | |

Petitioner Aaron L. Griffin, a state prisoner, has filed a Petition for Writ of Habeas Corpus, pursuant to Title 28, United States Code, Section 2254, challenging his conviction in San Diego Superior Court Case No. 267344. [Doc. No. 1, at p. 1.] Respondent filed an Answer to the Petition, along with points and authorities arguing that the Petition should be denied, because petitioner's claims lack merit and are procedurally barred. [Doc. Nos. 10, 10-1.] Petitioner did not file a traverse even though he was granted a generous amount of time to do so. [Doc. Nos. 14-17.] For the reasons outlined below, IT IS RECOMMENDED that the District Court DENY the Petition.

### *Procedural History*

On August 28, 2018, a jury found petitioner guilty of: Count One, first degree murder in violation of California Penal Code Section 187(a) with personal and intentional use of a handgun; Count 2, assault with a semi-automatic firearm in violation of

California Penal Code Section 245(b) with personal use of a firearm; Count 3, shooting at an occupied vehicle in violation of California Penal Code Section 246; and Count 4, shooting at an inhabited house in violation of California Penal Code Section 246.  [Doc. No. 11-3, at pp. 50-54.]  The trial court imposed a sentence of 50 years to life plus seven years eight months. [Doc. No. 11-18, at pp. 24-32; Doc. No. 11-22, at p. 2.]  In addition, the trial court imposed $10,000 in restitution plus various other fees and assessments.  [Doc. No. 11-18, at pp. 31-32; Doc. No. 11-22, at p. 2.]

Petitioner filed an appeal with the California Court of Appeal claiming prosecutorial misconduct; ineffective assistance of trial counsel; instructional error; and a violation of due process in imposing assessments, fees, and fines without an ability to pay finding.  [Doc. No. 11-19.]  The judgment was affirmed by the California Court of Appeal in an unpublished opinion filed on October 21, 2020.  [Doc. No. 11-22.]

Petitioner also filed a petition for review in the California Supreme Court raising the same issues addressed in his opening brief filed with the California Court of Appeal. [Doc. No. 11-27.]  The California Supreme Court summarily denied the petition for review on December 30, 2020.  [Doc. No. 11-28.]

On April 6, 2021, petitioner filed his Petition for Writ of Habeas Corpus in this Court, raising the same prosecutorial misconduct; ineffective assistance of counsel; instructional error; and due process claims that he presented to the California Court of Appeal and the California Supreme Court.   [Doc. No. 1, at pp. 6-23.]

### ***Factual Background***

The points and authorities filed by respondent include the full recitation of facts taken from the California Court of Appeal's unpublished opinion filed on October 21, 2020.  [Doc. No. 10-1, at pp. 11-16, quoting Doc. No. 11-22, at pp. 2-12.]  Briefly, the California Court of Appeal's opinion indicates petitioner is a member of the Neighborhood Crips gang, and he was involved in two shooting incidents in 2016, the second of which resulted in the death of Jamar, a known member of the gang known as West Coast Crips.

1    The first incident occurred on May 17, 2016 about 3:00 a.m., when multiple bullets

2    hit a home.  At the scene, police recovered six .45 caliber Winchester casings.  Bullets

3    went through a window and wall and bullet holes were found in the resident's car.  Jamar

4    lived in the house next door with his girlfriend and their five-month-old child.

5        The second incident occurred about 1:00 p.m. on May 27, 2016, ten days after the

6    first incident, at the intersection of Euclid and Market in San Diego.  Jamar was driving a

7    white Pontiac with his infant child in the back seat.  Petitioner was driving a white Jeep.

8    Shots were fired from both vehicles.  The Jeep drove away from the scene.  Jamar was

9    found bleeding and slumped between the two front seats of the Pontiac, reaching toward

10   the back seat where the baby was seated.  There was a gun in his lap.  When police

11   arrived, they were unable to detect Jamar's pulse.  An autopsy later indicated Jamar died

12   from a gunshot wound to the chest and he also had wounds to his right bicep and the

13   shoulder blade area of his back.

14       The white Jeep was later found parked in front of a residence not far from the

15   intersection.  There were bullet holes in the windshield and the driver's side door.  The

16   left rear tire was deflated.  Police traced the white Jeep to a rental company and learned

17   that petitioner rented the vehicle on May 5, 2016.  Ballistics evidence indicated that the

18   gun used in the first shooting incident on May 17, 2016 was the same gun used in the

19   second incident that resulted in Jamar's death.

20       The investigation also revealed that shots had been fired from both vehicles.  [Doc.

21   No. 10-1, at pp. 11-16, quoting Doc. No. 11-22, at pp. 2-11.]  There was evidence

22   suggesting that "the Jeep was positioned somewhat behind the Pontiac because the shots

23   into the Pontiac came from the rear into the driver's seat."  [Doc. No. 11-22, at p. 6.]

24   However, it was not possible to determine "who fired first," "the sequence of shots," or

25   "the exact positions of the vehicles at the start of the shootout."  [Doc. No. 11-22, at p. 6.]

26   "[A]t some point during the shootout the cars could have been side by side. . . ."  [Doc.

27   No. 11-22, at p. 6.]

28   ///

### *Discussion*

**I.     *Standard of Review*.**

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  "A federal court may not issue the writ on the basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "[A] mere error of state law is not a denial of due process."  *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted).  Under Section 2254(d) of AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of  a State court shall not be granted with respect to any claim that was adjudicated on the  merits in State court proceedings unless the adjudication of the claim--(1) resulted in a  decision that was contrary to, or involved an unreasonable application of, clearly  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(l) &(2).

For purposes of Section 2254(d)(l), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus relief.  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (concluding that the state court's decision did not unreasonably apply clearly established Supreme Court law, because the relevant cases provided "no clear answer to the question presented").

/ / /

1    The AEDPA standard is highly deferential and "difficult to meet." *Harrington v.*
2    *Richter*, 562 U.S. 86, 102, 105 (2011). Federal habeas relief may be granted under the
3    "contrary to" clause of Section 2254 if the state court applied a rule different from the
4    governing law set forth in Supreme Court cases, or if it decided a case differently than the
5    Supreme Court "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S.
6    685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state
7    court's application of clearly established federal law is objectively unreasonable." *Id.*
8    "[A]n unreasonable application is different from an incorrect one." *Id.* In other words,
9    Federal habeas relief cannot be granted simply because a reviewing court concludes
10   based on its own independent judgment that the state court decision is erroneous or
11   incorrect. *Id.* Habeas relief is only available under Section 2254(d)(l) "where there is no
12   possibility fair minded jurists could disagree that the state court's decision conflicts" with
13   Supreme Court precedent. *Harrington v. Richter*, 562 U.S. at 102. In addition, "review
14   under § 2254(d)(l) is limited to the record that was before the state court that adjudicated
15   the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

16   To be objectively reasonable, a state court's decision need not specifically cite or
17   rely on Supreme Court precedent. "[S]o long as neither the reasoning nor the result of
18   the state-court decision contradicts [Supreme Court precedent]," the state court's decision
19   will not be "contrary to clearly established Federal law." *Early v. Packer*, 537 U.S. 3, 8
20   (2002).

21   This Court gives deference to state court findings of fact and presumes them to be
22   correct; petitioner may rebut the presumption of correctness, but only by clear and
23   convincing evidence. 28 U.S.C. Section 2254(e)(1). Where, as here, there is no reasoned
24   decision from the California Supreme Court, this Court "looks through" to the underlying
25   appellate court decision and presumes it provides the basis for the higher court's denial of
26   a claim or claims. Ylst v. Nunnemaker, 501 U.S. 797, 805-806 (1991).
27   / / /
28   / / /

1    **II.     *Petitioner's Claim of Prosecutorial Misconduct.***

2         **A.     *Procedural Bar.***

3         Respondent argues that the District Court should reject petitioner's prosecutorial

4    misconduct claim, because it is procedurally barred from review in Federal Court under

5    the independent and adequate state law ground doctrine.  [Doc. No. 10-1, at p. 17.]  In

6    respondent's view, the independent and adequate state law ground rule precludes review

7    of petitioner's prosecutorial misconduct claim in Federal Court, because the California

8    Court of Appeal concluded on direct appeal that the claim was forfeited for failure to

9    object in the trial court.  [Doc. No. 10-1, at p. 18, referring to Doc. No. 11-22, at p. 11.]

10   According to respondent, forfeiture for failure to object in the trial court is a state

11   procedural bar that is independent and adequate.  [Doc. No. 10-1, at p. 18.]

12        "The [independent and adequate state law ground] doctrine applies to bar federal

13   habeas [review] when a state court declined to address a prisoner's federal claims

14   because the prisoner had failed to meet a state procedural requirement" that "rests on

15   independent and adequate state procedural grounds."  *Coleman v. Thompson*, 501 U.S.

16   722, 729-730, (1991).  *See also Calderon v. U.S. Dist. Ct. for E. Dist. of California*, 96

17   F.3d 1126, 1129 (9th Cir. 1996).  However, the doctrine does not preclude review of

18   petitioner's prosecutorial misconduct claim, because the California Court of Appeal

19   applied the forfeiture rule but then also considered the merits of petitioner's claim.  [Doc.

20   No. 11-22, at pp. 11-17.]  "If the last state court to be presented with a particular federal

21   claim reaches the merits, it removes any bar to federal-court review that might otherwise

22   have been available."  *Ylst v. Nunnemaker*, 501 U.S. at 801.

23        **B.     *The Merits of the Prosecutorial Misconduct Claim.***

24        Alternatively, respondent contends petitioner's prosecutorial misconduct claim

25   fails on the merits, because the prosecutor's comments to the jury were reasonable

26   inferences from the record and because the state court's rejection of this claim was

27   reasonable and not contrary to or an unreasonable application of clearly established

28   Supreme Court law.  [Doc. No. 10-1, at p. 20.]

21cv601-WQH(KSC)

To prevail on a claim of prosecutorial misconduct, a petitioner must show that the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000). In this regard, "[p]rosecutors are free in argument to suggest that the jury draw reasonable inferences from the evidence presented at trial." *United States v. Flores*, 802 F.3d 1028, 1035 (9th Cir. 2015). For example, "[i]n a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). Remarks that are "undesirable or even universally condemned" are not enough to establish prosecutorial misconduct. *Darden v. Wainwright*, 477 U.S. at 181.

Petitioner's prosecutorial misconduct claim stems from his assertion that he fired shots at Jamar in self-defense and that the prosecutor unfairly "asserted facts not in evidence" to refute his claim of self-defense when he told the jury petitioner waited for 30 minutes to ambush Jamar and when he referred to this theory as a fact. [Doc. No. 1, at p. 7.] According to petitioner, the prosecutor also unfairly told the jury that cell phone evidence proved petitioner waited for 30 minutes to ambush Jamar, even though the prosecutor's own expert testified that cell phone evidence could not pinpoint the location of a cell phone and could not show a cell phone was in a stationary location for 30 minutes. [Doc. No. 1, at pp. 7-8.]

Petitioner also complains that the prosecutor relied heavily and unfairly on "erroneous statements" to reinforce the planned ambush theory when he told the jury petitioner wore a ski mask during the shooting that was later found on the front seat of the white Jeep. Petitioner contends the prosecutor made these statements even though there was no evidence petitioner wore the ski mask during the shooting. Petitioner points out that a witness testified he saw petitioner at the intersection right after the shooting and

the witness was able to describe petitioner's skin color and hair which would have been covered if he had been wearing a ski mask. [Doc. No. 1, at p. 8.]

With respect to the ski mask, the California Court of Appeal's summary of the facts elicited at trial states as follows: "When police searched the Jeep, they discovered clothing and personal property in laundry baskets and miscellaneous bags in the back. Police recovered a black ski mask from the front seat area." [Doc. No. 11-22, at p. 5.] The California Court of Appeal's opinion also includes the following summary of testimony by the prosecution's expert about cell phone data obtained from petitioner's cell phone carrier around the time of Jamar's murder:

Criminal Intelligence Analyst Peter Villaver testified regarding cell phone data. He used a visual representation to show jurors cell towers activated by Griffin's phone the day of the shootout, from 11:00 a.m. to 3:00 p.m. [Footnote 3: Some of the cell phone tower activations indicated antenna directionality, and others did not.] The visual representation included two locations: the intersection at Euclid and Market, and the residence where the Jeep was found. He explained cell tower information was based on activity generated from voice calls and text messages; they could not pinpoint a phone's exact location, only general whereabouts. Cell tower information also did not indicate who was in possession of the cell phone.

If a cell phone is moving, it can transact with one cell tower or switch to another cell tower or a number of cell towers. Griffin's phone consistently activated the same general towers between 11:00 a.m. and 12:00 p.m., indicating the phone was in the East Village neighborhood during that time.

[Thereafter, t]he first activity occurred at 12:09 p.m., in the East Village. At 12:16 p.m., the cell phone activated a cell site in the area of Market Street and Interstate 15. At 12:19 p.m. and 12:23 p.m., Griffin's cell phone hit a tower in the Oakpark neighborhood. At 12:28 p.m., the phone was detected by a tower in the general area of Euclid and Market. The phone was detected by that same tower at 12:32 p.m., 12:39 p.m., and 12:56 p.m. There were additional detections in the same general neighborhood between 1:00 p.m. and 1:15 p.m. From 1:15 p.m. to 2:00 p.m., there were multiple hits to towers in the Fairmont Park and Oakpark areas, near where Interstates 805 and 15 cross. Villaver testified that there was one activation in the Golden Hill area during that same period, but because it occurred in the

1
2
3

midst of back and forth activities, it appeared the tower near Golden Hill was the best to provide service, but the phone was likely in the Fairmont Park or Oakpark area. Based on the saturation of cell towers, the phone was moving to the northwest away from the Market and Euclid intersection.

4
5
6
7

On cross-examination, defense counsel clarified with Villaver that the precise location of the phone could not be identified at any given activation, and that there was a range of area in which the phone could have been located.

8

[Doc. No. 11-22, at pp. 7-9. *See also* Trial Transcript at Doc. No. 11-13, at pp. 147-167.]

9
10
11
12
13
14
15

The California Court of Appeal's opinion acknowledges that the prosecutor, during closing arguments, "argued [petitioner] had committed first degree murder both because he had waited at the intersection to attack Jamar and because he fired from a vehicle. To support his first theory, the prosecutor relied on the cell phone evidence and commented on the presence of a ski mask recovered from the Jeep, as well as the possession of the gun used to kill Jamar. He argued [petitioner] had hunted Jamar and explained why self-defense could not justify [petitioner's] actions." [Doc. No. 11-22, at p. 9.]

16

Just prior to closing arguments, the trial court instructed the jury as follows:

17
18
19
20

Please keep in mind that what the attorneys will be telling you in their closing arguments is not evidence. You have heard all of the evidence that you are going to hear in this case. They will be, of course, reflecting on the evidence and explaining to you how they believe the evidence fits in with the instructions that I -- I read with you yesterday afternoon.

21
22
23
24
25

If they misstate something about the facts, in other words, if they state something about the facts that does not comply with your understanding of the facts, don't -- don't infer any motive on their part to mislead you. They're not going to do that. They are going to honestly tell you what they believe the facts have proved. But, ultimately, it's what you find to be the facts, that is what actually existed.

26

[Doc. No. 11-15, at pp. 3-4.]

27
28

Based on the record, the California Court of Appeal reached the following conclusion on petitioner's prosecutorial misconduct claim:

1
2
3
4
5
6
7
8

       The prosecutor inferred that the cell tower records showed Griffin remained at the intersection of Euclid and Market because the phone activations indicated he remained in the same area at 12:32, 12:39, and 12:56 p.m., the 30 minutes immediately preceding the shootout. He asked the jury to likewise infer the cell tower evidence placed Griffin at the scene, waiting for the opportunity to kill the victim. Whether the prosecutor's inference was reasonable was a question for the jury to decide. [Citation omitted.]  While the challenged remarks may have been hyperbolic, we cannot say they were based on evidence outside the record or that they were misleading.  [Citation omitted.]  Accordingly, this did not rise to the level of prosecutorial misconduct.

9

[Doc. No. 11-22, at p. 13.]

10
11
12
13
14
15
16
17
18
19
20
21

       Regardless of whether the prosecutor's comments during closing arguments about the cell phone evidence and the ski mask are viewed separately or together, they do not warrant Federal habeas relief, because they did not make the trial unfair.  The California Court of Appeal reasonably concluded the prosecutor's comments "did not rise to the level of prosecutorial misconduct."  [Doc. No. 11-22, at p. 13.]  The prosecutor was entitled to refute petitioner's claim of self-defense by citing evidence from the record that did not support it and to argue to the jury that petitioner did not shoot Jamar in self-defense. The cell phone evidence, although weak on this point, does suggest petitioner was in the area near the intersection about 30 minutes prior to the shooting waiting for Jamar to drive through, so it was fair for the prosecutor to refer to this evidence in support of his theory of the case.[1]  [Doc. No. 11-15, at p. 33.]

22
23
24
25
26
27
28

---

[1]     With respect to the cell phone evidence, the prosecutor stated as follows in closing argument:  "Jamar Johnson leaves that Albertson's in East Village at around 12:07. [¶]The defendant's phone activates in the East Village at around 12:09.  At 12:16, the phone is moving east about halfway between East Village and Market.  At 12:19 and 12:23, it's over here hear the 94. . . .  [¶]That main intersection you saw on the map yesterday with Detective Schaffer, that's just by that Balmoral house.  The main intersection, where if you're coming from the west or exiting from the 94 to the north,

Despite petitioner's contention, the prosecutor's arguments about the cell phone evidence are forceful and persuasive and possibly even "hyperbolic" as the California Court of Appeal referred to them [Doc. No. 11-22, at p. 13], but, taken in context, they are clearly presented as argument, not fact.  The prosecutor summarized the cell phone evidence in a chronological manner, apparently referring to demonstrative exhibits, and argued that the jury should infer from that evidence that petitioner waited near the intersection for 30 minutes prior to the shootout.  Even if it could be said that the prosecutor's words appear to present this evidence as fact, the trial court, as noted above, appropriately instructed the jury that the attorneys' argument are not facts. [Doc. No. 11-15, at pp. 3-4.]  "A jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Nor did the prosecutor make "erroneous statements about petitioner wearing a ski mask."  [Doc. No. 1, at p. 8.]  Rather, the prosecutor said petitioner "was sitting at that intersection with a .45-caliber semi-automatic handgun and a ski mask. That ski mask -- that is the only piece of clothing in the front passenger compartment.  The front passenger compartment and the driver's compartment there that -- are the only relatively clean area of the car.  The back is littered with clothing.  The only item of clothing left in the front of that car is the ski mask, sitting at that intersection for 30 minutes."  [Doc. No. 11-15, at p. 34.]  Later, the prosecutor said, "On May 27th, [petitioner] was the hunter and Jamar was the prey.  He snuck up with a ski mask and a gun at a tactical advantage, open fire. . . ."  [Doc. No. 11-15, at p. 39.]  The prosecutor's argument here is ___**not**___ that petitioner was ___**wearing**___ the mask.  Rather, it is apparent that

___

you would have to pass through to get back to that Balmoral house.  [¶]And the defendant's phone pings that intersection starting at 12:28, a half an hour before the murder, and he sits there pinging those towers right there at that intersection.  The defendant waited at Market and Euclid for 30 minutes.  We didn't hear any evidence that he lives by there.  He was staying by there.  It looks like they're living out of that Jeep." [Doc. No. 11-15, at p. 33.]

11

the prosecutor believes the ski mask suggests planning and hunting rather than a chance encounter between petitioner and Jamar (*i.e.*, that petitioner deliberately placed the ski mask in the front of the car so that it was accessible in case it was needed quickly to cover his face if the circumstances so required before, after, or during the planned shooting of Jamar). In other words, the prosecutor did not make an erroneous statement that petitioner wore the ski mask during the shootout, but he did ask the jury to infer that the presence of the ski mask in the front of the Jeep was indicative of planning and hunting rather than a chance meeting with Jamar at the intersection where the shootout occurred.

In *Darden v. Wainwright*, 477 U.S. 168, the Supreme Court stated that "[t]he weight of the evidence against petitioner was heavy . . . [and this] reduced the likelihood that the jury's decision was influenced by argument." *Id.* at 182. Here, it is worth noting that the weight of the evidence supported the prosecutor's theory of the case. The ski mask and the cell phone data were not the only pieces of evidence from the record that the prosecutor cited in support of his theory that petitioner did not shoot Jamar in self-defense but was instead hunting Jamar by waiting at the intersection to ambush him as he passed through the area. For example, the prosecutor cited the evidence of the first shooting in the middle of the night on May 17, 2016. In this regard, the prosecutor said, "The defendant was hunting Jamar Johnson. We see that in the May 17th shooting. He is shooting at a house. It looks like he thinks Jamar Johnson is in there based on where the car is. He doesn't know who else was in that house. He doesn't care. Endangering anybody who would be in that house. He was willing to stop at nothing to kill Jamar Johnson." [Doc. No. 11-15, at p. 31.] Based on the verdict, it is apparent that the jury believed petitioner was the shooter in the first incident on May 17, 2016, so they could reasonably infer what the prosecutor was suggesting based on this evidence – that petitioner was hunting Jamar and waited for him at the intersection where the shootout took place.

/ / /

In sum, based on this Court's review of the record, the prosecutor's conduct in referring to the ski mask and the cell phone evidence does not constitute misconduct and did not infect "the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainright*, 477 U.S. at 181. Therefore, the California Court of Appeal's rejection of petitioner prosecutorial misconduct claim is not contrary to, nor an unreasonable application of, clearly established Supreme Court law. Accordingly, IT IS RECOMMENDED that the District Court DENY petitioner's prosecutorial misconduct claim.

### III.    *Petitioner's Ineffective Assistance of Counsel Claim.*

As part of his prosecutorial misconduct claim, petitioner argues that he received ineffective assistance of counsel, because his trial attorney failed to object to the prosecutor's closing arguments about the cell phone and the ski mask. [Doc. No. 1, at p. 9.] In this regard, petitioner believes that his trial attorney should have informed the jury that the prosecutor's "statements of fact were not reasonably related or connected to the evidence" and that his arguments "were deceptive and misleading based on his own expert's testimony." [Doc. No. 1, at pp. 10.] As a result, petitioner claims that his trial attorney's "inaction was below prevailing professional norms." [Doc. No. 1, at p. 10.]

Respondent argues that petitioner's ineffective assistance of counsel claim should be rejected by the District Court, because the California Court of Appeal reasonably concluded there were sound tactical reasons trial counsel did not object to the prosecutor's arguments. [Doc. No. 10-1, at p. 25.] The California Court of Appeal also rejected petitioner's ineffective assistance of counsel claim, because "[t]here were tactical reasons that could explain why defense counsel did not object to various prosecution arguments." [Doc. No. 11-22, at p. 17.]

Trial counsel is generally presumed competent, so the burden rests on the accused to overcome this presumption and demonstrate a constitutional violation. *United States v. Cronic*, 466 U.S. 648, 658 (1984). To prevail on a claim of ineffective assistance of trial counsel, a habeas petitioner must show that "counsel made errors so serious that

21cv601-WQH(KSC)

counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at p. 688. When considering all of the circumstances, counsel must be given "wide latitude . . . in making tactical decisions." *Id.* at 689.  In other words, a reasonable tactical decision cannot serve as the basis for a finding that counsel was constitutionally ineffective. *Id.*  In assessing an ineffective assistance of counsel claim, Federal Courts must also be "highly deferential," avoid "the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

A habeas petitioner also cannot prevail on a claim of ineffective assistance of counsel without showing that counsel's performance prejudiced the defense.  *Id.* at 687. To establish prejudice, a defendant must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. at 112.  Because a defendant must prove both elements of the *Strickland* test in order to prevail, a court may reject a claim of ineffective assistance of counsel if it finds counsel's performance was reasonable, or the claimed error was not prejudicial.  *Strickland v. Washington*, 466 U.S. at 687.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential.' [citations omitted], and when the two apply in tandem, review is 'doubly' so.  [Citation omitted.] The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [Citation omitted.] Federal courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. at 105. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-787.

Here, the California Court of Appeal was justified in rejecting petitioner's ineffective assistance of counsel claim. First, for the reasons outlined in the previous section of this Report and Recommendation, the prosecutor's closing arguments did not constitute misconduct and were not deceptive or misleading. Second, this Court agrees with the California Court of Appeal that "[t]here were tactical reasons that could explain why defense counsel did not object to various prosecution arguments." [Doc. No. 11-22, at p. 17.] For example, as the California Court of Appeal noted in its Opinion, defense counsel "could have opted not to focus on whether [petitioner] was near the intersection before the shootout [or] the meaning of the mask." [Doc. No. 11-22, at p. 17.] Therefore, petitioner is unable to establish deficient performance on the part of his trial attorney or prejudice. Under these circumstances, the California Court of Appeal's rejection of petitioner's ineffective assistance of counsel claim is not contrary to, nor an unreasonable application of, clearly established Supreme Court law. Accordingly, IT IS RECOMMENDED that the District Court DENY petitioner's ineffective assistance of counsel claim.

## IV. ***Petitioner's Claim of Instructional Error.***

### A. ***Procedural Bar.***

Respondent argues that the District Court should reject petitioner's instructional error claim, because it is procedurally barred from review in Federal Court under the independent and adequate state law ground doctrine. [Doc. No. 10-1, at p. 26.] However, as outlined more fully above, the doctrine does not preclude review of petitioner's instructional error claim, because the California Court of Appeal applied the forfeiture rule but then also considered the merits of petitioner's claim. [Doc. No. 11-22,

at pp. 18-21.]  "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."  *Ylst v. Nunnemaker*, 501 U.S. at 801.

### B.      *The Merits of Petitioner's Instructional Error Claim.*

Petitioner's instructional error claim challenges the wording of CALCRIM No. 224, a standard jury instruction, which reads as follows:

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.
>
> Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

[Doc. No. 11-14, at pp. 132-133.]

Petitioner argues that CALCRIM No. 224 violated his right to due process and a fair trial, because of the use of the term "innocence" in the second paragraph of the instruction.  Because "innocence" was not defined, petitioner believes the jury could have misconstrued the instruction.  According to petitioner, the jury "should have been told that they were to adopt a reasonable interpretation that points to a reasonable doubt about guilt rather than one that points to innocence."  [Doc. No. 1, at p. 15.]

To the extent petitioner contends the instruction violates state law, respondent argues that petitioner's claim should be rejected, because it is not cognizable on Federal habeas review.  [Doc. No. 10-1, at pp. 26-27.]  Respondent is correct on this point.  "[F]ederal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Thus, to the extent petitioner contends the trial court's use of

21cv601-WQH(KSC)

CALCRIM No. 224 was a violation of state law, his claim is not cognizable on Federal habeas review.  *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991).

Respondent also argues that petitioner's instructional error claim should be rejected, because the challenged instruction did not have an impact on the jury's verdict.  According to respondent, the challenged instruction "clearly informed the jury that, before the jury could find [petitioner] guilty, it had to find that the evidence as a whole established beyond a reasonable doubt that [petitioner] was guilty of committing the murder."  [Doc. No. 10-1, at p. 30.]  As a result, respondent contends it was reasonable for the California Court of Appeal to reject this claim.  [Doc. No. 10-1, at p. 30.]

Noting that other California Courts had already rejected similar arguments, the California Court of Appeal denied petitioner's instructional error claim with the following explanation:  "The inclusion of the word 'innocence' does not lead us to conclude that the instruction has shifted the burden of proof.  Instead, the use of the word 'innocence' simply means 'less than that required to establish guilt.'"  [Doc. No. 11-22, at p. 21.]  The California Court of Appeal further explained that "the prosecution's burden of proof beyond a reasonable doubt was repeated in several other jury instructions . . . .   The burden of proof was also emphasized throughout closing arguments by both attorneys, so there was no uncertainty regarding what was required." [Doc. No. 11-22, at p. 21.]

Federal habeas relief is warranted when a petitioner can establish that an instruction to the jury "so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. at 72.  A jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record."  *Id.* (internal quotation omitted).  Even if a constitutional error is found in the instructions to a jury, a Federal Court must also assess the "prejudicial impact" of the error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014).  Under *Brecht*, 507 U.S. 619, a
/ / /

1  habeas petitioner is only entitled to relief if the error "had substantial and injurious effect

2  or influence in determining the jury's verdict." *Id.* at 637.

3       Here, considering the use of CALCRIM No. 224 along with the trial record and the

4  other instructions, this Court cannot agree with petitioner's contention that his right to

5  due process and a fair trial was violated because of the use of the term "innocence" in the

6  second paragraph of the instruction.  This instruction does not define the burden of proof

7  and is obviously intended only to assist the jury in considering circumstantial evidence.

8  As respondent contends, the instruction "does not use the term 'innocence' in a strict

9  sense, but provides it at one end of a spectrum, if 'one of those reasonable conclusions

10  p*oints to innocence* and another to guilt, you must accept the one that *points to*

11  *innocence*."  [Doc. No. 10-1, at p. 30, quoting CALCRIM No. 224.]

12       Additionally, the jury was instructed with CALCRIM No. 220, which clearly sets

13  forth the burden of proof and advises the jury that the defendant is presumed innocent;

14  that they must not be biased against the defendant just because he was arrested, charged

15  with a crime, or brought to trial; and that the People must prove the defendant guilty

16  beyond a reasonable doubt.  [Doc. No. 11-14, at pp. 129-130.]  As set forth in CALCRIM

17  No. 220, the trial court further instructed the jury that:  "Proof beyond a reasonable doubt

18  is proof that leaves you with an abiding conviction that the charge is true."  [Doc. No. 11-

19  14, at p. 130.]  In addition, the jury was instructed by the trial court with CALCRIM

20  No. 200, which provides in part as follows:  "Pay careful attention to all of these

21  instructions and consider them together."  [Doc. No. 11-14, at p. 127.]  "A jury is

22  presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. at 234.  It is also

23  noteworthy that petitioner's counsel took time during closing argument to explain the

24  meaning and the significance of this instruction to the jury.  [Doc. No. 11-15, at p. 45.]

25       Based on the foregoing, the challenged instruction did not violate petitioner's right

26  to due process and did not cause petitioner any prejudice.  Accordingly, the California

27  Court of Appeal's rejection of petitioner's instructional error claim was neither contrary

28  to, nor an unreasonable application of, clearly established Supreme Court law.  Therefore,

21cv601-WQH(KSC)

1    habeas relief is not warranted on this claim, and IT IS RECOMMENDED that the

2    District Court DENY petitioner's instructional error claim on the merits.

3    *V.*    ***Petitioner's Due Process Claim re Restitution, Fines, and Fees.***

4          At petitioner's sentencing hearing, the trial court imposed a restitution fine in the

5    amount of $10,000 to the state victim's fund.  A second restitution fine of $10,000 was

6    imposed but stayed unless supervision or parole is revoked.  In addition, the trial court

7    imposed a court security fee of $160, a critical needs act fee of $120, and a criminal

8    justice fee of $154.  Petitioner also stipulated to restitution in the amount of $5,600 to

9    cover Jamar's funeral expenses.  The amount of restitution to Jamar's child and the

10   child's mother were left to be determined at some later date.  [Doc. No. 11-18, at pp. 31-

11   34.]

12         In his final claim, petitioner argues his right to due process was violated because

13   the trial court imposed and began executing fines, fees, and assessments against him

14   without considering his present ability to pay.  [Doc. No. 1, at p. 19.]  Respondent argues

15   that the District Court should deny this claim, because it is procedurally defaulted for

16   failure to object in the trial court at the time the fines, fees, and assessments were

17   imposed and because petitioner has not shown cause and prejudice for his failure to

18   object.  Alternatively, respondent argues that the claim is not cognizable on Federal

19   habeas review, because a petitioner may only seek relief from a state-court conviction on

20   the ground that he is in custody in violation of the Constitution or Federal law.

21   According to respondent, petitioner's challenge to restitution, fines, and fees does not

22   contest the legality of his custody.  [Doc. No. 10-1, at pp. 31-33.]

23         The California Court of Appeal concluded that petitioner forfeited his right to

24   challenge the fines, fees, and assessments imposed against him, because he failed to

25   object in the trial court.  [Doc. No. 11-22, at p. 22].  Unlike the other claims in the

26   Petition, the California Court of Appeal did not consider the merits of this claim.  [Doc.

27   No. 11-22, at pp. 22-23.]

28   / / /

21cv601-WQH(KSC)

1   When a state prisoner has defaulted a Federal claim in state court because of an

2   independent and adequate state procedural rule, Federal habeas review of the claim is

3   barred, unless the prisoner can demonstrate cause for the default, actual prejudice, or a

4   fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 749-750. "A state

5   procedural default is independent unless it appears to rest primarily on federal law or

6   appears to be interwoven with federal law. A state procedural default is adequate if it is

7   firmly established and regularly followed by the time as of which it is to be applied."

8   *Tong Xiong v. Felker*, 681 F.3d 1067, 1075 (9th Cir. 2012) (internal citations and

9   quotations omitted).

10   Here, the California Court of Appeal's application of the contemporaneous

11   objection rule is "independent," because it is separate from and not interwoven with

12   Federal law. It is adequate, because the Ninth Circuit has recognized that "California

13   consistently applies its contemporaneous objection rule when a party fails to object."

14   *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011). Petitioner has not submitted,

15   and this Court has been unable to locate, any information indicating petitioner could

16   establish cause, prejudice, or a fundamental miscarriage of justice.

17   Additionally, as respondent contends, this claim presents a state law question that

18   cannot be challenged on Federal habeas review. In this regard, Federal Courts may

19   "entertain an application for a writ of habeas corpus in behalf of a person in custody

20   pursuant to the judgment of a State court only on the ground that he is in custody in

21   violation of the Constitution or laws or treaties of the United States." 8 U.S.C. § 2254.

22   Section 2254 "does not confer jurisdiction over a state prisoner's in-custody challenge to

23   a restitution order imposed as part of a criminal sentence." *Bailey v. Hill*, 599 F.3d 976,

24   981-984 (9th Cir. 2010). In reaching this conclusion, the Ninth Circuit explained that a

25   successful challenge to a restitution order could only reduce the amount of restitution

26   owed and the petitioner would "still have to serve the rest of his custodial sentence in the

27   same manner." Id. The same rationale applies to other types of fines and fees.

28   / / /

20

Therefore, petitioner's claim is not a cognizable claim for relief on Federal habeas review.

For the reasons outlined above, IT IS RECOMMENDED that the District Court DENY petitioner's claim that his right to due process was violated because the trial court imposed and began executing fines and fees against him without considering his present ability to pay.  This claim is procedurally default and does not state a cognizable claim for Federal habeas review.

### *Conclusion*

Based on the foregoing, IT IS RECOMMENDED that the District Court DENY all claims raised in the Petition.  [Doc. No. 1.]  Petitioner's prosecutorial misconduct, ineffective assistance of counsel, and instructional error claims lack merit.  Petitioner's claim that his due process rights were violated because the trial court imposed fines and fees without determining his ability to pay is procedurally defaulted and does not state a cognizable claim for Federal habeas review.

This Report and Recommendation is submitted to the assigned United States District Judge pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

IT IS HEREBY ORDERED that no later than ***April 22, 2022*** any party to this action may file and serve written objections to this Report and Recommendation.  The document should be captioned "Objection to Report and Recommendation.

IT IS FURTHER ORDERED that any reply to the objection shall be filed and served no later than ***May 7, 2022***.  The parties are advised that failure to file objections

/ / /

/ / /

/ / /

/ / /

/ / /

within the specified time may waive the right to raise those objections on appeal of this Court order. *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

      IT IS SO ORDERED.

Dated:  March 23, 2022

Hon. Karen S. Crawford
United States Magistrate Judge

21cv601-WQH(KSC)